**UNITED STATES of America,**
**Appellee,**

v.

**Orion T. WHITING, Jr., and Lucretia**
**Killings, Appellants.**

**No. 8646.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 1, 1962.

Decided Dec. 19, 1962.

Certiorari Denied March 4, 1963.
See 83 S.Ct. 882.

T. Emmett McKenzie, Washington, D. C., for appellants.

J. Hardin Marion, Asst. U. S. Atty. (Joseph D. Tydings, U. S. Atty., and Arthur G. Murphy, Asst. U. S. Atty., on brief), for appellee.

Before SOPER and BRYAN, Circuit Judges, and HUTCHESON, District Judge.

SOPER, Circuit Judge.

Orion T. Whiting, Jr., and Lucretia M. Killings appeal from judgments of the District Court based upon a jury verdict whereby they were found guilty of receiving wagers in a lottery operation without having previously paid the special occupational tax and without having registered and furnished information with regard to the business as required by the federal statutes and regulations. (See 26 U.S.C. §§ 4401, 4411, 4412, 4901, 7203, 7262, and 7272. C.F.R. Title 26 § 325.50) Whiting was sentenced to imprisonment for one year and fined $10,-000, and Killings was sentenced to imprisonment for 181 days and fined $1,000. The questions in issue relate to the validity and the execution of a search warrant, to the refusal of the Judge to order the disclosure of the names of the informers and to certain rulings on the admissibility of evidence, and to statements contained in the charge of the Judge to the jury.

A variety of circumstances led to the arrest of the defendants, the search of the defendants' premises and ultimately their conviction. Some time prior to June 1, 1960 agents of the Intelligence Division of the Internal Revenue Service received information from sources that had proved reliable in the past that Whiting and other persons were engaged in the operation of a lottery and that numbers slips regarding the daily wagers were being transported by automobile to a house on Leland Road in Prince George's County, Maryland. Accordingly, two special agents, Bedingfield and Ridolfi, were assigned to investigate. They had been informed by sources previously found reliable that Whiting had a reputation in Washington, D. C. as a numbers backer and that he had admitted to Internal Revenue Agents that he was engaged in a lottery. The agents knew that in November 1951 Whiting had paid a 10% excise tax on wagers accepted by him in that month, in conformity with 26 U.S.C. § 4401, and that at one time he had applied for a special occupational wagering tax stamp under 26 U.S.C. § 4411, but no stamp had been issued because of failure on his part to furnish the required information.

Accordingly, the agents kept watch on Whiting's movements on six days between June 1 and June 20, 1960. They observed that shortly before 3:00 P.M., on each of these days, Whiting would pick up his co-defendant, Killings, in his automobile at 14th Street and Saratoga Avenue in the city of Washington, and drive to a shopping center in Prince George's County where they would await the arrival of one C. J. Wilson, a convicted gambler, who would arrive about 3:30 P.M., in another automobile with a

colored girl, and park at the shopping center about a block away from Whiting's automobile. The girl would then leave the Wilson car carrying a large brown paper bag folded at the top and walk to Whiting's car and enter it. Whiting would then drive to a point one block away from the Center, let the girl out, drive away with the bag to a two-story house on Leland Road and drive into the garage in the basement. Whiting and Killings would remain inside the house for approximately an hour and then leave. The agents knew that Killings previously had been arrested for operating a lottery and that neither Whiting nor Killings nor Wilson had paid the special occupational wagering tax for the current fiscal year.

Armed with this information, the agents applied to the U. S. Commissioner for a search warrant to search the Leland Road house. They made an affidavit in which they set out the information they had received and the observations they had made; the Commissioner, being of the opinion that probable cause had been shown, issued the warrant on June 22.

On the afternoon of June 24 Agent Ridolfi watched while Whiting and Killings, following their usual routine, received a brown paper bag from Wilson and the colored girl and then drove to the house on Leland Road about 4:00 P.M. The search warrant was served shortly thereafter by two deputy marshals and six revenue agents. Several of the federal officers forcibly entered the house after they had disclosed their identity and had been refused admission. In a room on the second floor, they found numbers slips for June 24 spread out on the table and numbers slips for June 21, 22 and 23 in large brown paper bags and, in addition, adding machines and various items of gambling paraphernalia of the type normally used in numbers operations. The records disclosed a business of $2,000 a day with 65 writers and six to eight control men, to whom the writers report, engaged in the operation. The evidence indicated that in the lottery business the control men turn over the material to a pick up man, who delivers it to the banker.

■■ The defendants endeavored unsuccessfully to suppress the evidence secured in the search by motions addressed first to the United States Commissioner at the preliminary hearing, and later to the District Judge in advance of the trial. Their contention is that these motions should have been granted because the search warrant was issued without probable cause. They rely on Schencks v. United States, 55 App.D.C. 84, 2 F.2d 185 (1924), where it was said that an officer of the law may not use information furnished him as a basis for a search and seizure, and should not act until he has secured the affidavit of his informer to the truth of the information, to be obtained if necessary, by subpoena to appear before the Judge or the Commissioner. This is no longer the prevailing rule either in the District of Columbia or elsewhere. It is now established that probable cause exists when the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, are sufficient in themselves to warrant the belief of a man of reasonable caution that a crime is being committed. Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879; Washington v. United States, 92 U.S.App.D.C. 31, 202 F.2d 214, 215. Obviously, the information received by the agents in the instant case from previously reliable sources, supplemented by the knowledge acquired by the agents in their surveillance of the defendants' actions, furnished a sufficient basis for the finding of the Commissioner that there was probable cause for the issuance of a search warrant and also for the rejection by the court of the motion to suppress the evidence secured by the search.

■ The defendants further contend that the search warrant was illegally executed and, hence, the evidence obtained by the search should not have been admitted. The evidence on this point is not in dispute. The officers arrived at the house about 4:30 P.M. on June 24th.

A Deputy Marshal knocked on the front screen door, which was locked, and announced in a loud voice that he was a United States Marshal with a search warrant. The wooden door was open and through the screen the Marshal could see persons scurrying around at the top of the steps leading to the second floor. He called to them to come down and open the door, but nobody came. After waiting about a minute, he broke through the screen near the lock, reached in and unlatched the door and entered. At the time one Mary Proctor, the wife of the owner of the house from whom the defendants rented one room, was seated with her daughter-in-law on a screened porch at the side of the house. One of the officers who had a gun sticking out of his belt covered this entrance and told Mrs. Proctor not to move when she started to get up after hearing someone knock at the front door. Her daughter-in-law told her to sit down, and she did so. The door to the side porch and to the house were not locked.

Defendants argue that if the officer had allowed Mrs. Proctor to go to the front door when she heard the knock, she would have opened the door, and the need to use force would have been obviated. The relevant statutes are 18 U.S.C. §§ 3109 and 2234. Section 3109 provides that an officer armed with a search warrant may break open any outer door of a house to execute the warrant if after notice of his authority and purpose he is refused admittance.

Section 2234 provides that whoever in executing a search warrant wilfully exceeds his authority or exercises it with undue severity shall be fined not more than $1000 or imprisoned not more than a year. Defendants contend that the Federal agents used undue violence in breaking open the screen door at the front of the house and, hence, the search was illegal. We do not think that the

Deputy Marshal went beyond the permission of the statute. He had identified himself and had given notice of his authority to enter and had been denied admittance; and he had no notice that anyone inside the house was willing to open the door. Under these circumstances his use of only so much force as was needed to effect an entrance was not unreasonable.*

■ On several occasions during the preliminary proceedings and in the trial before the jury, the defendants sought unsuccessfully to compel the Government to disclose the names of the informers whose information led to the investigation. Their attorney stated that he did not need the names of the informers in order to present an affirmative defense but in order to show that the information did not contain sufficient "actual representation" to justify the issuance of the search warrant. We think there was no error in denying the names of the informers to the defendants. The Government is privileged to withhold the identity of persons who furnish information of infractions of the law to officials charged with its enforcement. The need to protect the sources of information which will enable the officers of the law to enforce the criminal law for the protection of the public has long been recognized. See Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); In re Quarles and Butler, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895); Vogel v. Gruaz, 110 U.S. 311, 4 S.Ct. 12, 28 L.Ed. 158 (1884). For an excellent historical discussion see the opinion by Justice Gray. Worthington v. Scribner, 109 Mass. 487; McCormick, Evidence, § 148; Uniform Rules of Evidence, Rule 36, It has been held, however, that the privilege must yield when the disclosure of the informer's identity is essential to the defense of the accused and to a fair determination of the cause.

---

* The opinion has been expressed that the use of unnecessary violence does not invalidate a search under a proper search warrant but merely subjects the offender to the penalties provided by § 2234. See

United States v. Freeman, (D.C.1957), 144 F.Supp. 669; Barrientes v. United States, 5 Cir., 235 F.2d 116, 117, cert. den. 352 U.S. 879, 77 S.Ct. 102, 1 L.Ed. 2d 80.

See Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938). In Roviaro, for example upon which the defendants particularly rely, the informer had helped to set up the occurrence which led to the prosecution for the illegal possession of narcotic drugs, and had been present when the crime took place and was the only witness upon whom the defendant could call to testify as to the transaction covered by the testimony of the Government witnesses. In the present case, however, we have no such situation for, as the attorney for the defendants admitted, the names of the informers were wanted in support of the effort to invalidate the search warrant and not to help the defendants in the presentation of their case.

■■ Subsequently, the defendants' attorney, in his cross-examination of Agent Bedingfield in respect to his expert opinion of the defendants' gambling operation, sought to impeach the witness by asking him whether in another criminal case previously tried in the Eastern District of Virginia he had not been asked by the District Judge to leave the stand because his testimony was unacceptable. The witness answered that the Judge had asked him to step down but had stated later to Treasury officials that he was probably in error in taking this action. In pursuing this line of cross-examination, the defendants' attorney offered the transcript of the proceedings in the earlier case, but the Judge refused to let the attorney pursue this collateral line of investigation. This decision was obviously correct. A witness may be questioned as to past misconduct even as to collateral matters in order to impeach his credibility; but the interrogator is bound by his answers and may not contradict him, and the extent of the examination is within the discretion of the trial judge. Simon v. United States, 4 Cir., 123 F.2d 80, 85. In the pending case the agent answered the question and admitted that he had been asked to leave the stand in an earlier case. Under these circumstances the trial judge was entirely justified in refusing to admit the record of the earlier trial since it would have tended to confuse the jury as to the issues it was called upon to decide. The Judge's action is supported by abundant authority. Herzog v. United States, 9 Cir., 226 F.2d 561, 565; 235 F.2d 664; cert. den. 352 U.S. 884, 77 S.Ct. 54, 1 L. Ed.2d 59; Travis v. United States, 10 Cir., 269 F.2d 928, 939–940; Nashville Interurban Railway v. Barnum, 2 Cir., 212 F. 634; United States v. Bender, 7 Cir., 206 F.2d 247.

■ It is also contended that Judge Chesnut erred when he refused at the trial of the case to permit the attorney for the defendants to ask Agent Bedingfield on cross-examination in respect to the identity of the persons who informed him that Whiting was a banker in the lottery business. The attorney asserted that his purpose was to inquire into the validity of the search warrant. The Judge refused to permit this line of questioning because Judge Northrop, in a two-day preliminary trial proceeding in the District Court, had entertained a motion to suppress the evidence obtained under the search warrant, had heard witnesses and argument on the motion and had held that the search warrant was valid. Judge Chesnut ruled that his colleague's determination should be accepted as final unless new evidence was presented. No such evidence was presented. Judge Chesnut's ruling was, therefore, correct. See United States v. Wheeler, 256 F.2d 745 (3 Cir., 1958); rehearing, 172 F.Supp. 278, 279–281; aff'd 275 F.2d 94, 97 (3 Cir., 1960); Jennings v. United States, D.C., 19 F.R.D. 311, 312, aff'd 101 U.S.App.D.C. 198, 247 F.2d 784, (D.C. CCA 1957); Waldron v. United States, 95 U.S.App.D.C. 66, 219 F.2d 37, 40–41. Cf. Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307.

■ The defendant Killings contends that she was prejudiced in her defense by the refusal of the District Judge to permit Agent Ridolfi to answer a question as to the part Killings had in the gam-

bling operation. Agent Ridolfi was asked by defendant's attorney whether during his investigation he had expressed an opinion as to whether Mrs. Killings was a banker or an employee of the business. The U.S. Attorney objected to the question and was sustained by the Judge. The defendant's attorney was referring to an incident that occurred at the hearing before Judge Northrop of the motion to suppress the evidence when Agent Ridolfi testified that he had received information that Whiting and Killings were operating a numbers business and that Whiting was a principal in the business and that Mrs. Killings was aiding him as an employee. The ruling was correct. If the witness had answered the question, he would have given hearsay testimony. It was entirely proper for Agent Ridolfi to testify at the preliminary hearing that he had received information from trustworthy sources which led him to investigate and to swear out a search warrant. For this purpose, the hearsay was relevant, but it was not proper when the witness was testifying as to facts within his own knowledge bearing on the criminal charge in trial before the jury. It is significant that although the agents were admitted to be experts qualified to express an opinion as to whether Killings was a banker or merely a banker's helper, neither agent was asked by either party to testify on this point. Agent Bedingfield did testify that in his opinion, based upon what he had seen, Whiting was a banker. However, no testimony was offered on behalf of either defendant.

 The defendants moved the court to dismiss the information on the ground that the Government was barred or estopped from prosecuting them because in November, 1951, Whiting had applied for a wagering tax stamp, and his application had been refused. This matter was first brought to the ⟋ attention of the court before the trial by a plea en bar. Evidence was taken which showed that an unsigned application on behalf of Whiting was filed accompanied by a payment of $50.00 which was retained pending investigation. After the expiration of the fiscal year (on June 30, 1952) for which the tax was paid, a return was filed on Whiting's behalf, and a 10% excise tax was paid for wagers accepted between November 1 and November 9, 1951. Thereafter, on May 21, 1953, the Internal Revenue Service returned $16.60 and retained $33.34 of the $50. payment for the two-thirds of the fiscal year from November 1, 1951 to June 30, 1952. No tax stamp was issued since the fiscal year had expired when the settlement was finally made in October 1952. The defendants' position seems to be that the Government is precluded from pressing the charges in the instant case relating to the year 1960 because it failed to issue the tax stamp for the fiscal year 1951–1952. The contention is so inapposite and futile that it need not be discussed.

The defendants finally complain of certain rulings of the Judge on requested · instructions to the jury and of certain portions of the Judge's charge. These matters may be disposed of summarily since as to each item the position of the defendants is entirely devoid of merit.

 The Judge was asked to direct a verdict for the defendants even though the uncontradicted evidence was that they were in the numbers business and each day went to an appointed place to receive the wagers for the day preparatory to paying the winners. Despite this testimony and the undisputed testimony of the acknowledged experts that the activities which they witnessed constituted the operation of a lottery, the defendants insist that the Judge should have entered a directed verdict on their behalf. The contention answers itself.

 The defendants took no exception to the Judge's charge although an opportunity to do so was offered to them and, therefore, they are precluded from objecting to it in this court, unless it should appear to the court that an error occurred which clearly prejudiced the defendants in the trial of the case. See Rule 30, Federal Rules of Criminal Procedure. United States v. Borda, 4 Cir., 285 F.2d 405, 407; Coppersmith v. Unit-

ed States, 4 Cir., 176 F.2d 353, 354. We find no error in the charge which fairly presented the case to the jury.

 The defendants say that the instruction in regard to the weight to be given to circumstantial evidence was incorrect because the Judge did not charge the jury in the language held to be desirable in Cuthbert v. United States, 5 Cir., 278 F.2d 220, 224. The Supreme Court, however, has held in Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), that this instruction is not required when the jury is properly instructed as to the standards for reasonable doubt, for in such case an additional instruction on circumstantial evidence is confusing and incorrect. In this instance, the Judge correctly instructed the jury, in effect, that whether the evidence was direct or circumstantial the burden was on the Government to prove the defendants' guilt beyond a reasonable doubt and that unless the evidence as a whole left the jury with an abiding conviction to a moral certainty of the truth of the charge they should acquit.

An effort was made in the course of the argument to minimize the part played by Mrs. Killings in the operation of the business for the purpose of showing that she was not engaged in the business in some proprietary way. The testimony was, however, that the two defendants engaged in exactly the same activities. In each incident portrayed in the testimony they appeared and acted together. It is true that an expert opinion based on the evidence was given that Whiting was a banker and that no opinion on this point as to Killings was expressed. The fact is, however, that no opinion as to Killings' part in the business was asked; and, since the evidence as to each defendant was identical, the submission of the case to the jury as to each was required.

The Judge, however, was careful to follow the rulings laid down by the Supreme Court on the interpretation of the relevant statute in United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed. 2d 1394 (1956), and Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L. Ed.2d 1503 (1958). He called attention to the argument, on behalf of the defendants, that the evidence showed that any connection which they may have had with the business was merely subordinate, such as a pickup man, or messenger, or a bookkeeper; and he instructed the jury that they should acquit the defendants, or either of them, unless they should find that they were respectively engaged in the business as bankers, or writers accepting wagers from others, or acting in some proprietary way.

The judgment of the District Court is affirmed.

Affirmed.

